UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| UNITED STATES *ex rel*. | ) | |
| CHRISTOPHER F. YOUNG, | ) | |
| | ) | |
| Plaintiff-Relator, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| vs. | ) | 9:20-2959-BHH |
| | ) | |
| LAFARGE, S.A., LAFARGE | ) | |
| CORPORATION, LAFARGE | ) | FILED *IN CAMERA* |
| NORTH AMERICA, INC., | ) | UNDER SEAL |
| LAFARGE BUILDING | ) | |
| MATERIALS, INC., CEMENTOS | ) | AMENDED COMPLAINT |
| ARGOS S.A., ARGOS USA CORP., | ) | Jury Trial Requested |
| ARGOS CEMENT LLC, ARGOS | ) | |
| READY MIX LLC, ELITE | ) | |
| CONCRETE LLC, ELITE | ) | |
| CONCRETE HOLDINGS, LLC, | ) | |
| ELITE CONCRETE OF SC, LLC | ) | |
| COASTAL CONCRETE, INC., | ) | |
| COASTAL CONCRETE | ) | |
| COMPANY, INC., COASTAL | ) | |
| CONCRETE SOUTHEAST II, LLC, | ) | |
| EVANS CONCRETE HOLDINGS, | ) | |
| INC., EVANS CONCRETE, L.L.C., | ) | |
| THOMAS CONCRETE, INC., | ) | |
| THOMAS CONCRETE OF GEORGIA, INC., | ) | |
| THOMAS CONCRETE OF SOUTH | ) | |
| CAROLINA, INC., GREG MELTON, | ) | |
| PAT MOONEY, | ) | |
| RICHARD A. STANKWYTCH, | ) | |
| TROY D. BAIRD, HURLEY S. | ) | |
| COOK, DAVID MELTON, TIM | ) | |
| COUGHLIN, TIM MAHONEY, | ) | |
| TOMMY STRICKLAND, and | ) | |
| TIMOTHY "BO" STRICKLAND, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**INTRODUCTION**

1.     This action arises out of antitrust conspiracy involving the above-named Defendants, among whom are corporate entities that are the largest Ready-Mix Concrete producers in Southeast Coastal Georgia and Southeast Coastal South Carolina, to recover civil penalties and damages arising from Defendants' actions in submitting and causing to submit false claims to the United States Government, the States of South Carolina and Georgia, along with several municipal and local government entities, including counties, schools, local public boards, bodies or commissions, hospitals, and other political subdivisions of the States and local governments.  Defendant Argos USA, Inc. ("Argos"), and its predecessor Lafarge North America, Inc. ("Lafarge") are at the center of these conspiracies.  Defendant Greg Melton, Division Manager for Argos, conspired with other Defendants, both natural persons and corporate entities above named, to fix prices of concrete and "divide up the pie" giving each conspirator a piece of the local business by rigging bids.  Greg Melton with the knowledge, support, and complicity of his supervisors at Lafarge/Argos entered into these unlawful agreements with "competitors" that were actually co-conspirators, allowing them to cheat federal, state, and local governments out of millions of dollars.  By entering into these unlawful agreements to fix prices and rig bids among co-conspirators, Greg Melton and Argos, effectively created their own cement and concrete cartel in Southeast Coastal Georgia and South Carolina.

2.     Relator had worked as a sales manager for Lafarge in Northwest, Georgia and General Manager for West Atlanta and North Alabama prior to working in the Savannah, Statesboro, and Hilton Head market, and transferred to the sales area within the company on or about February 2010.  Shortly after his transfer to the Savannah and surrounding area, he began observing Lafarge/Argos and Greg Melton, participating in conspiracies with Defendants Elite Concrete,

LLC and their affiliates ("Elite"), Coastal Concrete, Inc., which was in Georgia and South Carolina, and their affiliates ("Coastal"), and Evans Concrete, L.L.C. and their affiliates ("Evans"). Relator observed that Greg Melton and Lafarge/Argos were engaged in a conspiracy in order to suppress and eliminate competition in the concrete market by fixing prices, rigging bids, and/or allocating jobs and territories. The actions of Greg Melton and Lafarge/Argos in conspiring to engage and engaging in this behavior was a *per se* unreasonable restraint of trade under the Sherman Act and federal antitrust law.

3.      Relator gathered evidence, including audio recordings that the Defendants have engaged and are engaging in conspiracies and entering unlawful agreements to fix prices, rig bids, and allocate jobs and territories amongst the conspirators, which artificially inflates the prices of ready-mix concrete in the region of Southeast Coastal Georgia and South Carolina. In recordings, audio and written documents, Defendants have admitted to fixing prices, rigging bids, and allocating territories and percentages of that market, and these agreements to engage in non-competitive behavior have impacted interstate commerce and have caused some of their customers, including governmental entities, to pay higher prices for ready-mix concrete.

4.      Defendants' conspiracies concerned a highly standardized and interchangeable product and occurred against a background of supply and demand factors that were common to all customers. Moreover, Argos was the supplier of Portland cement, one of the main ingredients of ready-mix concrete, to some or all of the Defendants. Argos also supplied aggregate materials used in the production of ready-mix concrete. Because of the standardization, interchangeability of the product, and the fact that Argos was a major supplier of one of the main components of ready-mix concrete, setting prices and making parallel price movements among the conspirators was facilitated. These conspiracies occurred on a backdrop of Argos attaining vertical integration of

the cement and ready-mix concrete market throughout the Southeast (by acquiring dozens of cement plants, ready-mix concrete plants, cement terminals, and other facilities), thus solidifying its dominance in the market. As a result of the conspiracies and Defendant Argos' vertical integration of the local market, Defendants were able to suppress and eliminate competition by artificially lowering their prices in bids for projects when outside competitors, or non-conspirators, because they were able to artificially sustain or raise the price of ready-mix concrete paid by customers victim to the conspiracy among Defendants. Underbidding non-conspirator competitors was accomplished through the use of rebates from Argos Cement, LLC., the supplier of the cement component of ready-mix concrete. Moreover, this pernicious, anti-competitive practice of weaponizing rebates from Argos Cement, LLC, to underbid non-conspirator competitors, along with underpricing ready-mix concrete, was perpetuated to effectively squash any competition in the Savannah/Hilton Head Market and other areas including Atlanta, Charleston, Macon and other territories in Florida, so that Argos and their conspirators could, in turn, raise and sustain prices as they pleased after the competitors were eliminated or otherwise neutralized in the market.

5.      In addition to their anti-competitive bidding practices and the artificially lowering the prices of cement and ready-mix concrete, Argos attempted to exclude non-conspirator competitors in the ready-mix concrete market from obtaining supplies such as cement or aggregate, and by selling an inferior concrete mix with a disproportionate amount of inexpensive fly-ash to finishers that refused to collude in their anti-competitive and fraudulent conspiracies.

6.      Through their unlawful agreements and conspiracies, Defendants violated the False Claims Act in the following particulars:

> (a)      making, using or causing to be made or used, false statements and representations about their pricing and bidding in order to secure government contracts and

payments;

(b)    failing to fulfill contract bidding and performance requirements and related laws and rules, that preclude contractors from engaging in anticompetitive and collusive activities, including bid-rigging, price fixing and related agreements;

(c)    offering inducements, coercing, or otherwise inducing companies which submitted low bids for contracts to withdraw or otherwise curtail shipments under those contracts and submitting or causing others to submit higher bids for the same work;

(d)    continuing on a regular and systematic basis to submit invoices and other documents to the Government seeking reimbursement for charges artificially established through the conspiracies.

7.    This is an action by Relator Christopher F. Young, to recover penalties and damages from the false statements or records submitted or caused to be submitted by Defendants to the United States Government, the State of South Carolina, the State of Georgia, and any local governments or political subdivisions in order to obtain payments of Federal funds.

## II.

## JURISDICTION AND VENUE

8.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein;

9.    Relator brings this action on behalf of himself and the United States, for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, seeking penalties and damages in connection with violations of 31 U.S.C. §§ 3729-3733.

10.    Relator provided written disclosures and material information to the United States prior to

the filing of this Complaint.

11.    This Court has Federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

12.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District.  In addition, many acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

13.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.  Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil or administrative hearing in which the government is already a party, or in congressional, government accountability office, or other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(a).

14.    To the extent that there has been a public or other disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(b).  Relator has direct and independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the United States before filing this *qui tam* action based on that information. Since the filing of this action, certain Defendants have been indicted and the Argos Defendants have entered into a deferred prosecution agreement with the government. Relator was the original source of the information that led to the prosecution of those Defendants.

15.    In addition to the FCA violations stated herein, Relator also brings suit pursuant to the retaliation proscriptions of the False Claims Act,  U.S.C. § 3730(h).

16.    Relator is entitled to and demands a trial by jury.

### III.

### PARTIES

17.     Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein;

18.     Relator Christopher F. Young is a resident of South Carolina and a United States citizen. Relator Young was employed by Argos (formerly owned by Lafarge) as a Sales Manager for Savannah, Statesboro, and Brunswick, Georgia, and Hilton Head and the Lowcountry of South Carolina.  He held this position since around February 2010.  Relator has been in the construction business for over 30 years and has been in the ready-mix concrete business since 1997, when he was hired by Defendant Pat Mooney at Blue Circle North America, Inc., which was acquired by Lafarge on or about 2001.  Relator received a Bachelor's degree in criminal justice from Troy State University in 1993.

19.     Relator is the original source of the information in this Complaint, pursuant to 31 U.S.C. § 3730(e)(4) and thus has direct and independent knowledge of the information alleged herein. Within weeks of taking his position as Sales Manager of Argos on or about February 2010, Relator began to observe these illegal price-fixing and anti-competitive activities.   Disturbed and concerned, he sent a number of emails from early 2010 to late 2011 to Pat Mooney, the President of Lafarge (later Argos), outlining, among other things, the price fixing between Greg Melton and his brother David Melton at Elite.  Pat Mooney did nothing to correct the situation and in 2011 after sending further emails reporting this continuing legal activity, Pat Mooney called Relator and threatened him and said "Don't ever email me that sh_t again! I have had to send this to the Company attorney."  Relator got the message to be quiet, not complain and go along with the activities or be terminated.  Relator began to be concerned about his job and career, and also as a

result of reporting the antitrust conspiracy and cartel, Relator was denied promotions, transfers and other career advancements.

20.    Additional persons not named as Defendants herein are known to have participated as co-conspirators with the Defendants and have performed acts in furtherance of the conspiracy. Among those persons is James Pedrick.  Other persons, firms and corporations not named as Defendants herein may have participated as co-conspirators with the Defendants, and may have performed acts in furtherance of the conspiracy.

21.    Relator met with the Federal Bureau of Investigation ("FBI") and the Atlanta Antitrust Field Office of the U.S. Department of Justice (the "DOJ") in late 2011 regarding the facts recited herein and continued to communicate with them and provide evidence detailing Defendants' price fixing schemes and conspiracy through December 2012.  More recently, relator met with representatives of the FBI, U.S. Postal service, and the Department of Justice in December 2019, concerning Defendants' violations of the False Claims and Sherman Anti-Trust Acts.  Relator has remained in contact with authorities prosecuting Defendants for Sherman Anti-Trust violations and other criminal acts and was instrumental in bringing evidence that resulted in the August 2020 indictment of Defendants Gregory Melton, David Melton, Timothy "Bo" Strickland, and Argos, among other yet unnamed corporate Defendants, and the deferred prosecution agreement Argos Defendants entered with the U.S. government.

22.    Defendant Lafarge, S.A. is a publicly traded corporation based in Paris, France.

23.    Defendant Lafarge Corporation is a foreign corporation created in Maryland. Upon information and belief Defendant's principal office is located in Reston, Virginia.

24.    Defendant Lafarge Building Materials Inc. is a foreign corporation created in Alabama. Upon information and belief Defendant's principal office is located in Reston, Virginia.

25.     Defendant Cementos Argos S.A. is a publicly traded corporation based in Columbia, South America.  According to its website (www.argos-us.com/Why-Argos/History), Cementos Argos, based in Medellin, Columbia is the fifth largest cement producer in Latin America and the fourth largest concrete producer in the United States.

26.     Defendant Argos USA Corp. is a foreign corporation created in Delaware. According to its website (www.argos-us.com/Why-Argos/History), in 2005, Argos USA acquired Southern Star Concrete Company (50 ready mix plants in Texas and Arkansas) Concrete Express (six ready mix plants in Georgia and South Carolina) and a cement terminal in Houston Texas.  In 2006, Argos acquired Ready Mixed Concrete Company (approximately 80 Ready Mix plants in North Carolina, South Carolina and Virginia). In 2007, Argos acquired Central Aggregates LLC (sand reserves), Houston Ready Mix (four Ready Mix plants in Texas and Chalico (one Ready-Mix plant in Texas)).  **On its website, Argos boasts that it acquired cement and ready mix assets (two cement plants, a clinker mill, 79 concrete plants and six terminals) from Lafarge, *thus becoming vertically integrated in the Southeastern United States*.**  In 2012, it began expansion of the Harleyville, South Carolina cement plant, further expanding its capabilities in South Carolina.  In 2014, Argos acquired cement and ready-mix assets (one cement plant, two grinding mills, and approximately 70 ready mix plants) from Vulcan Materials Company in Florida.  Argos currently employs thousands of people and has scores of facilities across the Southeastern United States.

27.     Defendant Argos Cement LLC is a foreign limited liability company created in Delaware and its principal office is located in Alpharetta, Georgia.

28.     Defendant Argos Ready Mix LLC is a foreign limited liability company created in Delaware.  Defendant is located in Alpharetta, Georgia.

29.     Defendant Elite Concrete, LLC is a foreign limited liability company created in Georgia. Defendant is located in Bloomingdale, Georgia.

30.     Defendant Elite Concrete Holdings, LLC is a foreign limited liability company created in Georgia.  Defendant is located in Bloomingdale, Georgia.

31.     Defendant Elite Concrete of SC, LLC is a domestic limited company organized and existing under the laws of South Carolina.  Defendant is located in Bloomingdale, Georgia.

32.     Defendant Coastal Concrete, Inc. (South Carolina) is a domestic corporation organized and existing under the laws South Carolina.  Defendant is and was at all times relevant to this action located in Bluffton, South Carolina and Pooler, GA.

33.     Defendant Coastal Concrete Company, Inc. is a foreign corporation created in Georgia. Defendant is located in Pooler, Georgia.

34.     Defendant Coastal Concrete Southeast II, LLC is a foreign limited liability company created in Delaware.  Defendant is located in Pooler, Georgia.

35.     Defendant Evans Concrete Holdings, Inc. is a foreign corporation created in Georgia. Defendant in located in Claxton, Georgia.

36.     Defendant Evans Concrete, L.L.C. Inc. is a foreign corporation created in Georgia. Defendant is located in Claxton, Georgia.

37.     Defendant Greg Melton is an individual and on information and belief is a resident of Georgia and is a United States citizen.

38.     Defendant Pat Mooney is an individual and on information and belief is a resident of Georgia and is a United States citizen.

39.     Defendant Richard A. Stankwytch is an individual and on information and belief is a resident of North Carolina and is a United States citizen.

40.     Defendant Troy D. Baird is an individual and on information and belief is a resident of South Carolina and is a United States citizen.

41.     Defendant Hurley S. Cook is an individual and on information and belief is a resident of Georgia and is a United States citizen.

42.     Defendant David Melton is an individual and on information and belief is a resident of Florida and is a United States citizen.

43.     Defendant Tim Coughlin is an individual and on information and belief is a resident of Georgia and is a United States citizen.

44.     Defendant Tim Mahoney is an individual and on information and belief is a resident of Georgia and is a United States citizen.

45.     Defendant Tommy Strickland is an individual and on information and belief is a resident of Georgia and is a United States citizen.

46.     Thomas Concrete, Inc. ("Thomas Concrete") is a foreign corporation created in Georgia. Defendant is located and based out of Atlanta, Georgia.

47.     Thomas Concrete of Georgia, Inc. ("Thomas Georgia") is a foreign corporation created in Georgia.  Defendant is located and based out of Atlanta, Georgia.

48.     Thomas Concrete of South Carolina, Inc. ("Thomas South Carolina) is a domestic corporation operated and existing under the laws of South Carolina and with its principal places of business located in South Carolina.

## IV.

## TRADE AND COMMERCE

49.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein;

50.    Defendants produced and/or sold ready-mix concrete in a continuous and uninterrupted flow of interstate commerce to purchasers throughout the United States, including without limitation, purchasers in the States of South Carolina and Georgia.  These business activities and their conspiracies substantially affected interstate trade and commerce.  Moreover, the ready-mix concrete produced and sold by Defendants is comparable to, and interchangeable with, the ready-mix concrete produced and/or sold by their competitors.

## V.

## READY-MIX CONCRETE CHARACTERISTICS

51.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein;

52.    Ready-mix concrete is a compound of cement, water, aggregates, and sometimes additives such as fibers, mesh, and chemical admixtures.  Cement and sometimes fly ash, slag, or silica, is mixed with water to make a binding medium into which sand, gravel, rocks and other aggregates are embedded.  Ready-mix concrete remains in a fluid state for a period of no more than a few hours, during which time it can be transported to customers, placed, molded, and formed.  Ready-mix concrete hardens over time into a strong and durable material.

53.    Different types of cement, cementitious materials, and aggregates affect the performance and cost of ready-mix concrete, and make up the largest raw material cost for the production of ready-mix concrete.  Admixtures in the form of fibers, mesh, chemicals and powders are added to ready-mix concrete to modify the fluid characteristics, slump, setting properties, cure time, finished properties, finished strength, density and appearance of the final product.

54.    Ready-mix concrete is manufactured in batch plants.  Ready-mix concrete ingredients are sometimes mixed in the batch plant and sometimes mixed in mixing or agitator trucks.  Ready-mix concrete can be batched by the plant according to several mix designs and customer specifications.  It is typically delivered to customers in mixing or agitator trucks.

55.    The production, delivery, use, and fluid and finished characteristics of ready-mix concrete are subject to well-established industry and governmental standards intended to ensure the consistency, predictability, reliability and uniformity of ready-mix concrete.  Standards for ready-mix concrete are propounded and published by ASTM International, the American Concrete institute, and state transportation and highway agencies in South Carolina and Georgia.

56.    The common standards applicable to ready-mix concrete are known and consistently relied upon and applied by the Defendants, engineers, architects, designers, builders, quality control specialists and others.  All of the ready-mix concrete manufactured and sold by each of the Defendants conformed to, or were supposed to conform to, these common industry and governmental standards.

57.    Ready-mix concrete, including the ready-mix concrete manufactured and sold by each of the Defendants, is and was used principally in commercial, agricultural, governmental, and residential construction projects, including sidewalks driveways, foundations, walls, bridges, roads, slabs, tunnels, highways, and livestock confinement structures.  The common standards applicable to ready-mix concrete applied to all of the uses of the ready-mix concrete sold by the Defendants.

58.    Because of common industry and governmental standards, ready-mix concrete, including that manufactured and/or sold by each of the Defendants, is highly interchangeable and homogenous.    Ready-mix concrete is a commodity, which is interchangeable across

manufacturers.  Although construction projects can be bid under various concrete specifications, all of the Defendants have, or are employed by entities that have, the equipment and expertise to meet these specifications.

59.    Interchangeability of the ready-mix concrete is also illustrated by the fact that Argos sells cement, the primary and most expensive component of ready-mix concrete, to other Defendants including Coastal, Elite, and Evans.

60.    When products offered by different suppliers are viewed as interchangeable by the purchaser, it creates an environment more conducive for the suppliers to unlawfully agree on the price for the product, and in turn to effectively monitor and enforce agreed-upon prices.  This behavior is also facilitated by Argos' control and vertical integration of the market in the Southeastern United States.

61.    Because of its unique characteristics, there are few if any economic substitutes for ready-mix concrete, making demand for the product highly inelastic.  "Elasticity" is a term used to describe the sensitivity of supply and demand changes to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small (if any) decline in the quantity sold of that product.  In other words, customers have nowhere to turn for alternative, cheaper products of similar grade or quality, and so continue to purchase despite a price increase.

62.    In a Decision and Order, the Federal Trade Commission initiated an investigation and challenged Defendant Lafarge, S.A. and Lafarge Corporation's acquisition of certain voting securities of target Blue Circle Industries, PLC and affiliates, several of which were located in Marietta, Georgia and ordered the divestiture of certain assets.   The FTC determined that it had reason to believe that said parties violated Section 7 of the Clayton Act and Section 5 of the Federal

Trade Commission Act.  A Consent Order was entered into for the divestiture of certain assets on or about 2001.  See Decision and Order *In the Matter of Lafarge, S.A., Blue Circle Industries PLC, and Blue Circle, Inc., Docket No. C-4014 (2001).*  These are some of the same assets and facilities that Argos acquired from Lafarge in 2011 and are the subject of this action.

63.     Lafarge was fined over $100 million by the European Commission for participating in a price fixing plasterboard cartel along with others in France, Britain, and Germany (New York Times online edition, November 27, 2002).  Plasterboard like concrete is widely used in the building industry.  It was reported that Lafarge had committed their second infringement of European Union Law on restructure agreements, having already been fined once in 1999 (*Europa* online edition, November 27, 2002).

64.     In November 2007, the Brazilian branch of Lafarge agreed to pay a fine of $24.2 million to CADE, the Brazilian antitrust agency.  The company also signed a commitment to halt all activity that may be deemed as contributing to a cement cartel (Global Cement Magazine, February 2008, P. 54, see also Bloomberg online, November 28, 2007).

65.     On or about December 2008, the parent of Argos, Cementos Argos, S.A., was ordered to pay a fine and was found by Columbia's antitrust agency to have fixed prices in the second half of 2005.  The regulator found there was an exchange of confidential information between Cementos Argos  and two other companies and contacts between officials.

66.     Lafarge appealed this decision but was ordered to pay a fine of  $249.3 million antitrust fine levied by European Union regulators in June of 2010.

67.     In June 2012, it was also reported that Lafarge and other companies were fined a total of approximately $1.1 billion by the Competition Commission of India (*Financial Times* online, June 21, 2012).

68.     In a memorandum created and promulgated by Bill Wagner, president of Argos USA, LLC, in 2001, when he was the President of Blue Circle Concrete, which was subsumed by Lafarge, and later Argos USA, LLC, Bill Wagner describes in great detail how Blue Circle engaged in practices to effectively eliminate competition from competitors in the Southeast Coastal South Carolina and Georgia markets, which created a roadmap for some of Argos' anti-competitive practices.  The memorandum which is disclosed with the filing of this Complaint, provides, inter alia, that in order to effectively squash competition with CEMPAC, a group of cement and ready-mix companies that were importing cheap foreign cement, Blue Circle and its conspirators would have to "dramatically lower ready-mix concrete prices removing profitability from the ready-mix market in Savannah" so as to have a "maximum impact" on the profitability of David Howard's business (David Howard was president of Conex, a cement/ready-mix company that led CEMPAC).

69.     This Blue Circle memorandum created by the current president of Argos USA, LLC, illustrates a pattern of behavior that helps characterize its anti-competitive and illegal conduct; the memorandum also demonstrates the systemic, anti-competitive nature of Argos' business practices in the Southeast Coastal South Carolina and Georgia markets which were not simply limited to a few bad actors in the Savannah and Statesboro areas; rather the anti-competitive behavior was a endemic to Argos' entire business in the Southeast, including Florida, South Carolina, Georgia, and North Carolina.

70.     The product characteristics of ready mix concrete, including the common ingredients and manufacturing process of the product, the applicability of common ingredients and manufacturing process of the product the applicability of common industry and governmental standards to the product, the interchangeability and homogeneity of the product, the lack of substitutes for the product, the inelasticity of demand for the product, and Argos' commanding market share and

vertical integration of the Southeast market substantially furthered the ability of the Defendants to effectively conspire, by setting prices, rigging bids, and allocating territories, in the sale of ready-mix concrete to its customers.

## VI.

## MARKET AND PRICING FOR READY-MIX CONCRETE

71.     Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein;

72.     The standardized, interchangeable, and homogenous character of ready-mix concrete has resulted in a well-defined and common product market among the Defendants and their customers. For example, the Defendants' price sheets include mixes and mix categories, alternative aggregates, chemical admixtures, fibers, seasonal charges and off-hour delivery and delivery charges that are substantially identical.  Further, the Defendants have all used common terminology to refer to mixes and mix categories, within their bids and other price proposals made to customers.

73.     Each of the Defendants identifies the ready-mix concrete mixes or categories of mixes that they sell using common terminology, including "3000," "3500," "4000," numbers such as "3000" refer to the finished compressive strength of the ready-mix concrete in terms of pounds per square inch or "psi."

74.     The largest share of ready-mix concrete sold by the Defendants falls into just a few mixes or mix categories.

75.     Only three mixes or mix categories (3000, 4000, and 5000 psi) account for the great majority of all sales by the Defendants.

76.     The price of the most commonly sold ready-mix concrete, 3000 psi, was understood and

used by Defendants and their employees as a reference from which the prices of most or all other mixes could be determined.  Thus, if one Defendant knew that another Defendant was offering 3000 psi at a particular price, it could determine the price offered by the other Defendant for most or all other mixes.

77.    Increases in the price of all mixes could be and were expressed in a single dollar amount. Thus, if one Defendant communicated to another Defendant or a customer that the original Defendant was increasing prices by $6.00 for a given year, it was understood by the second Defendant or customer that this meant a $6.00 increase for the base prices of ready-mix concrete.

78.    The prices of mixes or mix categories that were stated on Defendants' price sheets were used as a starting point when Defendants and their employees determined negotiated or discounted prices to offer in bids, quotes, annual contracts and other pricing.  Further, at various times some or all Defendants offered standard discounts form the prices for mixes or mix categories that were stated on their price sheets to certain categories of purchasers or for certain uses.

79.    The common price sheets used by the Defendants to announce list prices[1] for common mixes, mix categories, additives, and additional charges were created by all Defendants on an annual basis during the first quarter.  In 2011 and through 2016, this was preceded by meetings with Defendants where they discussed and agreed upon price increases, prior to placing in the US mail.  Rarely, revised price sheets were created during the year to account for price changes.  The price sheets to their known customers by mailing to customer lists and/or by hand delivery to larger customers.  Price sheets were provided to potential customers by all Defendants upon request. Price sheets were used by dispatchers and other employees of all Defendants to determine list prices or standardized discount prices and were posted or available at all plants.

---

[1] Price increase letters among competitors were collected and distributed by James Pedrick, Argos salesman for Savannah, Statesboro, Hilton Head, Beaufort, and Brunswick, so there would be uniform pricing.

80.    Defendant Ready-Mix concrete companies would also provide discounts through rebates from Argos Cement, and by setting and, if necessary, later reducing environmental and fuel surcharges, which was completely fabricated by Defendants, and the proceeds of which were never paid to any governmental entity or used for environmental or remediation purposes. In fact, on May 12, 2016 Greg Melton laughed and stated that he is going to jail if the EPA shows up. Prior to that he stated that the company needs to start loading materials at 4 a.m. so no one can see how badly Argos was dusting the environment surrounding the plant.

81.    Importantly, Defendants charged these environmental and fuel surcharges in government jobs, which were bid-rigged and in geographical areas of the market where their anti-competitive practices had eliminated non-conspirator competitors from the market. Essentially, Defendants would not give rebates or waive surcharges on jobs wherein there were no non-conspirator competitors, including government projects.

82.    The product market and pricing practices were common and highly structured among all Defendants. The common price sheets, the common product mixes, the small number of mixes accounting for the great majority of Defendants' sales volume, the common reference point mix prices, the common method of expressing price increases, and the common practice of determining negotiated and discounted prices by reference to price sheet prices all substantially furthered the ability of the Defendants to effectively conspire, by setting prices and rigging bids, in the sale of ready-mix concrete to their customers, and to monitor and enforce their collusive agreements.

83.    As a result of the concerted efforts of the Defendants, the average sales price for the Savannah/Hilton Head market increased from $72 per yard in 2010 to $109 in 2016.

84.    For further example of the coordination of price increases, on October 1, 2014, Argos issued a price increase letter increasing price by $10 per cubic yard effective January 5, 2015. On

October 24, 2014, Thomas Concrete issued a price increase letter with an identical price increase.

## VII.

## MARKET CONCENTRATION AND ARGOS' VERTICAL INTEGRATION OF THE MARKET

85.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein

86.    Concentration in a particular industry facilitates the operation of a price-fixing conspiracy because it makes it easier to coordinate behavior among co-conspirators, and at the same time it makes it more difficult for customers to avoid the effects of collusive behavior.  The ready-mix concrete industry in the area of Southeast Coastal South Carolina and Southeast Coastal Georgia, served by the Defendants (collectively the "Southeast region") was highly concentrated, with Defendants manufacturing the vast majority the ready-mix concrete purchased in the region.  The Defendant companies possessed market power in the Southeast region, such that they were able to substantially influence or control the price of ready-mix concrete sold.

87.    Defendants market concentration was compounded by the fact that by 2011, **_Argos had, in its own words, achieved vertical integration of the Southeast region_**, by acquiring cement plants, ready-mix concrete plants, cement terminals, and sources of aggregate materials.

88.    The manufacture and sale of Ready-Mix concrete in Statesboro Georgia where Georgia Southern University is located was dominated and tightly controlled by Defendants Lafarge/Argos and Evans.  Additionally, these Defendants are actively engaged in a cartel which is in the process of eliminating competition within the area, and blocking entry from outside competition, through sharing information and fixing prices for every project bid for Georgia Southern University.  Bo Strickland and Greg Melton would agree on bidding price and terms to permit the other to win agreed upon contracts.  The effect of this concentration and control was enhanced by the sharing

of pricing, price increase letters and customer information of the Defendants by certain individuals, and the purchasing of concrete by Evans with Lafarge/Argos.  Evans (among other Defendants) buys its cement from Argos, and Argos buys some of their sand from Evans.  Evans sold a number of Savannah Plants in the mid-2000s and held onto 5 plants (including Statesboro).  Argos acquired these plants from Lafarge in 2011.

89.     Defendants have through their conduct conspired to drive up prices throughout the Southeast Region, but especially inside of the Savannah/Hilton Head market.[2]

90.     The manufacture and sale of ready-mix concrete in Savannah Georgia is dominated by Defendants, Lafarge/Argos, Elite, and Coastal.  Greg Melton's brother, David Melton, who was until approximately 2006, the general manager of Lafarge/Argos in Savannah runs Elite or did during a certain period of time relevant to this action.  Defendant Lafarge replaced David Melton with his brother Greg Melton who was then working in Pensacola, Florida for Lafarge. Additionally, these Defendants actively engage in the process of eliminating competition within the area and blocking entry from outside competitors through sharing information such as price bids, customer orders, and price increase letters.  Coastal bought, and its successor Thomas Concrete buys, cement from Argos Cement. The reliance among Defendants and their co-conspirators to purchase raw materials and services from each other created additional opportunities to manipulate prices.

91.     After Argos' acquisition of additional assets from Lafarge in 2011, it became vertically integrated, and became the second largest cement producer in the Southeast region and the fourth largest in the U.S.

92.     Pat Mooney, who is, or was for certain periods of time relevant to this action, President of

---

[2] It should be noted also that the Savannah area price was, at certain times relevant to this action, up to $8.00 a yard higher than the Macon, Georgia market.

Argos Southeast, Greg Melton of Argos, and David Melton, are all close friends and attended high school together at Shamrock High School on or about 1982.

93.    One of the largest customers in the Savannah area is U.S. Army Base Fort Stewart, home of the 3rd Infantry Division, which is the largest military institution in the Eastern United States. Also located nearby in Savannah, Georgia is Hunter Army Airfield, which has approximately 5,000 soldiers, airmen and coast guardsmen on station.  It is also home for the aviation units of the 3rd Infantry Division headquartered at Fort Stewart.  The U.S. Coast Guard Air Station is also located there.

94.    There are only three ready-mix concrete suppliers who could handle the orders for these military bases, Argos, Coastal, and Elite, who were all conspiring to fix the price of ready-mix concrete.

95.    The market in which the Defendant companies were dominant suppliers of ready-mix concrete was geographically well-defined by the delivery ranges of the Defendants' plants. Competition from suppliers outside this geographic market did not substantially affect the ability of the Defendants to exert control over the price of ready-mix concrete in their geographic market, because the limited delivery range of these potential competitors made them few in number.  These potential competitors, therefore, did not have an incentive to compete aggressively on price or territory.

96.    Ready-mix concrete plants have a limited delivery range for both technical and economic reasons.  Because of its setting properties, ready-mix concrete is a perishable product that must be delivered to its destination in specially designed trucks within a limited amount of time.  According to ASTM International standards, ready-mix concrete must be discharged no later than 1 ½ hours after either the water is mixed with the cement and aggregates or the cement is mixed with the

aggregates, or before the drum on a rotating drum truck completes 300 revolutions, unless the purchaser waives these requirements. In hot weather or other conditions that could cause the ready-mix concrete to set more quickly, ASTM International standards permit the purchaser to require discharge before 1 ½ hours elapse.

97.    Delivery range may also be affected by economic factors related to transportation costs and downtime of equipment. Thus, a supplier may assess the profitability of a particular delivery distance by reference to fuel costs and the cost of lost use of plant and trucks resulting from longer delivery and return times.

98.    However, the effect of delivery range on the ability of the Defendant companies to compete on price, in the absence of collusion in the form of price-fixing, bid rigging, and territorial allocation, is lessened by two significant factors. First, many of the purchasers of ready-mix concrete in the Defendants' geographic market are contractors who are not geographically fixed in one location. Instead, they service projects and purchase materials throughout the region. Second, most or all of the Defendants offered annual price quotes, derived from their price sheet or lists prices, to their larger purchasers without knowing and without regard to the location of the plant from which the ready-mix concrete would be delivered.

99.    Absent conspiracies by Defendant companies, distance to the job site, delivery range would affect pricing; however, in the presence of such collusion, each Defendant company priced ready-mix concrete in accordance with the conspiratorial agreement when price bidding on jobs.

100.    Delivery range also limited the ability of ready-mix concrete companies from outside the Southeast region to compete with the Defendant companies. Using the same 20-mile range for delivery, it is apparent that only a limited number of outside company plants could sell ready-mix concrete for delivery in a location serviced by the Defendant companies.

101.    In addition to exerting a large amount of control and maintaining a large amount of market share, Defendants enacted a scheme to underbid any competitors that attempted to enter the Southeast market, whereby they could submit artificially lower bids against non-conspirator competitors, because they were artificially maintaining and raising prices when non-conspirator competitors did not bid on jobs in that market.  Argos cement, led by President Chip Hussey, approved the rebates against certain actual competitors but would not allow rebates to be used against the co-conspirators.

102.    As discussed, Defendants weaponized the use of rebates from Argos cement by factoring in rebates when Defendants were bidding against non-conspirator competitors and by charging more by not applying the rebates when non-conspirator competitors were not bidding on jobs.

103.    Similarly, Defendants would weaponize environmental and fuel surcharges, waiving them only when they needed to compete on bids with non-conspirator competitors for jobs.

104.    Defendants, thus, overcharged the government and private businesses alike in bids wherein only conspirators placed bids or where the Defendants had so successfully squashed competition through their anti-competitive practices that no non-conspirator competitors would bid.  As a result, Argos typically went high on D.O.T. Projects and often won jobs at numbers as high as $150 per yard

105.    In addition to the weaponization of rebates and surcharges to facilitate bid rigging and territorial allocation, these conspiracies existed along a corporate culture and backdrop of coordinated anti-competitive behavior as outlined in the Blue Circle memorandum by Bill Wagner, whereby competitors were systematically choked out of the market by artificially lowering prices for an extended period of time to hurt non-conspirator competitors' profits in the ready-mix concrete market.

106.    The well-defined geographic market serviced by the plants of the Defendant companies, when coupled with the near complete supplier concentration held by Defendant companies and the limited ability and the limited ability and incentive of outside companies to compete in the region, provided Defendants with the ability to effectively sustain or raise the price of ready-mix concrete in their service areas through collusion on prices, bids, and territories.

# VIII.

## LAFARGE/ARGOS/ELITE/COASTAL CARTEL AND CONSPIRACY IN THE SAVANNAH AREA MARKET

107.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein

108.    Defendant Greg Melton, Division Manager in charge of sales and pricing of Lafarge/Argos in Savannah and Statesboro, Georgia and Hilton Head, South Carolina and Relator's direct supervisor has and exercised full and final authority over all pricing decisions for ready-mix concrete sold by Lafarge/Argos.

109.    Defendant David Melton, General Manager and Director of Operations of Elite Concrete, and brother of Greg Melton (and former General Manager of Defendant Lafarge in Savannah), has and exercised full and final authority over pricing decisions for ready-mix concrete sold by Elite. Defendant David Melton exercised final authority for prices of ready-mix concrete, additives, and related charges that were stated on price sheets, stated in bids, stated in quotes or otherwise offered to customers or applied to sales by Elite.

110.    Defendants Tim Mahoney, a salesman, and Tim Coughlin, President of Coastal, exercised full and final authority over all pricing decisions for ready-mix concrete sold by coastal. Defendants Mahoney and Coughlin exercised final authority over all pricing decisions of ready-

mix concretes, additives and related charges that were stated on price sheets, stated in bids, stated in quotes or otherwise offered to customers or applied to sales by Coastal.

111. From at least 2010 through at least 2016, based on evidence gathered by Relator, Defendants Greg Melton, David Melton, Tim Coughlin, and Tim Mahoney engaged in ongoing and job specific discussions concerning the prices that their respective companies would charge for ready-mix concrete and reached specific agreements setting such prices in the Savannah and nearby markets, including those in South Carolina.[3]  Within weeks of beginning his position in Savannah, Relator was directed by Greg Melton to let Elite and Greg's brother David have 75% of the residential business in Savannah.  For example, on February 24, 2011, Relator sent another email to Pat Mooney complaining that Greg Melton called him because his brother, David Melton at Elite had "cut his price $9.00 a yard."  It was obvious that Greg Melton and David Melton had bid rigged so that David Melton at Elite could win this bid.  Relator never received a response from Pat Mooney.  As another example, as a result of the price fixing between Greg Melton at Lafarge/Argos and David Melton at Elite, Relator sent an email to Pat Mooney dated September 15, 2011 with an email subject "I am not selling for Elite anymore."

112. Consequently, Terry Varnadore and V.B. construction would be the victims of yet another facet of Defendants' anti-competitive and illegal conduct and conspiracies, as Argos intentionally sold Terry Varnadore and V.B. Construction ready-mix concrete with inappropriate additive and aggregate content that made the concrete useless for its intended purpose, both structurally and for safety of the consumer; Argos then told customers that Terry Varnedore had used too much water in the concrete, blaming the defective concrete on the purchaser.

113. Defendant Argos intentionally sold Terry Varnadore, V.B. Construction, among others,

---

[3] Part of the agreement among conspirators was for Greg Melton and Tim Coughlin to communicate to employees that they could "fire any salesman who cuts a price without obtaining a copy of a competitors quote."

defective concrete in furtherance of its conspiracies to squash competition, when V.B. Construction and other finishers began taking a greater part of the local market share and as they gained the ability to have bargaining power in the market and potentially purchase from other suppliers of ready-mix concrete;

114.    In addition to exacting pecuniary harm upon these finishing companies and damaging their reputation in the construction contracting industry, when they became too large a part of the local market and, therefore, a threat to their anti-competitive conspiracies in the form of a potential business partner to a competitor, the defective concrete sold to V.B. Construction was also cheaper to produce, so Argos also made a greater profit, while blaming any deficiencies in the concrete on improper use by V.B. Construction and others;

115.    During this time period, these Defendants engaged in discussions and meetings (including at the Hooters Restaurant in Savannah, the Cracker Barrel in Pooler or Savannah, Georgia, the Sunshine Restaurant in Savannah, and at one of Argos' facilities in Blythewood, South Carolina), Defendants issued their annual price sheets.  Defendant Greg Melton told Defendants David Melton,  Trey Cook of Elite, Andy Stankwytch and others the price or price increases that would be reflected on Lafarge/Argos price sheets and annual pricing and Defendants David Melton and Tim Mahoney or another Coastal employee agreed that the price sheets and annual pricing would reflect the same prices or price increases.

116.    That on May 14, 2013, the Relator met with Greg Melton and Jim Pedrick to discuss how to take over a greater market share from Mayson Concrete in the Savannah Hilton Head market. During that conversation, Jim Pedrick, Argos Cement, called Jimmy Carson, a salesman for Holcim Cement, the only "competitor" for Argos Cement in the region, seeking information on how much cement Holcim was selling to Mayson Concrete.  Jimmy Carson returned the phone

call and gave him information regarding Mayson Concrete and told Jim Pedrick that he will call him back with more accurate numbers. Throughout the meeting the representatives for Holcim Cement, Argos Cement, and Argos Ready-Mix exchanged detailed information regarding volumes and prices regarding Evans Concrete, Elite Concrete, and Mayson Concrete. All of which served to drive up the price of cement and ready-mix concrete in the market in addition to other anti-competitive purposes. This information was then given to Andy Stankwytch, Greg Melton's boss.

117. That Mayson Concrete was subsumed in whole or in part by Southeastern Readymix Concrete, LLC, which has continued to be prey to Defendants anti-competitive behavior;

118. Defendants Greg Melton, David Melton and Tim Mahoney reached agreements concerning the price sheets, list or base prices, or increases of such prices, to be charged by their respective companies, including Lafarge/Argos, Elite and Coastal from at least 2010 through at least 2016.

119. For example, on or about February 2012, Jim Pedrick, cement salesman at Lafarge/Argos called the Relator and told him that competitor Elite will be putting out a price increase letter in the next few days. Jim Pedrick told Relator that Greg Melton had instructed him to tell David Melton at Elite to go to $86.00 per yard with a [sliding] fuel charge. Jim Pedrick asked the Relator to get a copy of this price increase letter so that he could take it to Coastal because Coastal wanted a price increase as well.

120. On March 7, 2012, Defendant Greg Melton told Relator that he had met with his boss, Andy Stankwytch, Division Regional Manager of the Carolinas and Savannah for Lafarge/Argos, Trey Cook, Co-owner of Elite and David Melton of Elite met at the Cracker Barrel in Savannah or Pooler, Georgia and decided that all such Defendants would, on behalf of their respective companies, effective April 1, 2012, increase their price sheet, list or base prices for ready-mix concrete to $86.00 per yard. They then all agreed that any salesman who cut a price without first

seeing a competitor's quote would be fired.

121.    By way of further example, and to help illustrate the importance of the use of fuel and environmental surcharges, in recordings Relator submitted to the FBI, dated November 19, 2012, Jim Pedrick says that Tommy "Bo" Strickland said he was pricing 3000 psi concrete at $88 per yard plus tax with no environmental fee and that Bo would charge $5 a yard more for a 4000 psi mix; Jim stated that Bo thought that Argos were quoting 3000 psi concrete at 86 per yard plus fuel so Bo thought we were even, and Jim told other employees of Argos to adjust our price so we were even with Evans Concrete on a job; further, in a January 29th, 2013 conversation with Jim Pedrick, Jim said that he told Bo Strickland that Argos would be pricing at $92 a yard in Statesboro and that Jim said that Bo will not charge fuel or environmental fees;

122.    Between September and October of 2013, Argos, Evans and other competitors issued price increase letters of $8.00 more per cubic yard with an environmental fee continuing at $5.00 per load, with the fuel surcharge schedule remaining in effect for 2014 (anywhere between $7.00 and $25.00 per load, depending on the price per gallon of diesel fuel), for the Savannah, Macon, Columbus, and Atlanta Markets; this coincided with price increase letters noting an increase of $8.00 per cubic yard around the same time from Vulcan Materials and Coastal Concrete.

123.    In the summer of 2012, Relator produced proof to Pat Mooney and Andy Stankwytch that Elite was quoting a cheaper price to a large residential customer, V.B. Construction, including that Greg Melton had set LaFarge/Argos' price much higher so that his brother Greg Melton at Elite would win the business.  Pat Mooney later phoned Relator before the March 2013 Antitrust Meeting that Relator was "smart enough to figure out what that [March 7, 2013] meeting was about".

124.    It was not uncommon for David Melton of Elite to share with his brother Greg Melton at

Lafarge/Argos the mix designs for bids at a variety of projects including those at Fort Stewart. In many of these instances, the brothers had agreed which company would win a specific bid and in fact, shared the mix costs on such bids so that the winning bidder would provide the "low winning bid." One such example was a bid dated February 8, 2012 which contained a hand-written note from Greg Melton directing Argos employee, Ryan Parker to "figure mix cost using our materials for a bid of Elite's mix designs for the U.S. Army at Fort Stewart . . ." (Elite bid dated February 8, 2012).

125.    The brothers, Greg Melton and David Melton spoke at least several times per week and compared customers prices and job bids. In addition, Relator observed brothers Greg Melton and David Melton even shared proprietary information (non-standard special mix for commercial use at Fort Stewart in February 2013) and has documentation of the same. Greg Melton and David Melton had agreed to fix prices to let David Melton and Elite win. Additionally, Argos Cement refused to authorized rebates if competing with Evans Concrete, but would allow rebates to outbid non-conspirator competitors. Relator also observed Greg Melton sharing Argos P&L's and bid lists including bid prices with brother David Melton.

126.    In addition, when other smaller competitors would not comply with price fixing, members of the cartel would threaten them that they would sell below cost long enough on any jobs up for bid by the smaller competitors and ruin them financially. Argos President, Bill Wagner, referred to this as "dropping the hammer".

127.    When it became more clear to management at Argos and Elite that Mr. Varnadore and V.B. Construction took issue with price increases and the manipulation of the market and its consequential effect on his business's profitability, he became one of the targets of their bad concrete scam as previously discussed;

128.    **The salesmen and upper management of Lafarge/Argos have known for years of these practices.**  Besides the complaints of Relator to upper management at Lafarge/Argos, on or about August 23, 2012, Tommy Waters, a salesman at Lafarge/Argos told Relator that in Hilton Head, South Carolina, he had informed David Howard (Argos' V.P. of Innovation) of the continued price fixing between David Melton and Greg Melton in Savannah. Tommy Waters said David Howard told him that he had informed Andy Stankwytch (Greg Melton's boss) and that Andy had informed Greg Melton.

129.    These agreements among the Defendants to coordinate their price fixing and price increases for ready-mix concrete was knowingly implemented by their respective supervisor and companies.  The price sheets from which all prices were obtained or derived reflected substantial "parallel pricing" in the actual net price increases.

130.    The sharing of prices and fuel and environmental surcharges among competitors was not merely part of a local conspiracy in the Savannah market; rather, in the case of Argos, it was a companywide practice.

131.    In fact, the Relator and employees of Argos in the Savannah/Hilton Head market were directed to coordinate with Argos' main office in Alpharetta, Georgia for pricing and fuel and environmental surcharges, which were then distributed or caused to be distributed to conspirator competitors throughout Georgia, South Carolina, and North Carolina.

132.    Direct purchasers include various governmental entities such as Fort Stewart, Hunter Army Airfield, Savannah International Airport, Chatham Area Transit, and a number of schools and other government projects through Southeast Coastal South Carolina and Georgia including Atlanta projects such as Truist Park and the new Mercedes Benz Dome. Many of these projects were bid by Defendant through commercial concrete contractors and other third party contractors and

subcontractors (such as Choice Concrete Construction, LLC) and were substantially impacted by this cartel conspiracy between these Defendants on behalf of their respective companies to fix prices and allocate projects.  These purchasers paid substantially more for ready-mix concrete than they would have in the absence of Defendants' conspiracies and suffered injury to their business and property.  **In fact, on average Fort Stewart jobs were sold for between $10.00 - $12.00 per yard higher than in nearby Macon as a result of this cartel and conspiracy.**

133.    Moreover, government jobs, while requiring less effort (as they were typically bigger and required trucks "to dump and go," as opposed to pouring concrete little by little on residential or smaller jobs, were sold on average around $10.00 per cubic yard higher than residential jobs which were more time-consuming;

134.    An example of the federal government being overcharged for ready-mix concrete due to Defendants conspiracies occurred in early 2013, with a job contracted by Sepi Engineering to build a dog kennel facility at Fort Stewart, wherein only conspirators bid on the project, and as a result, the government was fraudulently charged by one of the conspirators more than what would typically be charged in a free market exchange, in addition to fraudulent fuel and environmental surcharges.

135.    In an example of Defendants' far reaching, interstate conspiracy affecting government and taxpayer funded projects, on or about September 2013, Argos' fraud reached the literal bridge between South Carolina and Georgia, touching both states, as Argos submitted, and/or caused to be submitted, fraudulent requests for payment for concrete poured and work performed on the back water bridge on Highway 17 on the state line, among other projects.

**136.    Other government and taxpayer funded projects which were bid on by Defendants and which Argos or their conspirators above named fraudulently charged the government**

for, by means of their bid-rigging, conspiratory price fixing/increases, and fraudulent fuel and environmental surcharges include, but are not limited to:

    a.    204 Interchange Improvements, completed on or about 2/1/2016 (9552 yards)

    b.    US 80 SR Bridge, completed on or about 6/1/2015 (5,550 yards)

    c.    UAV (Fort Stewart), completed on or about 12/1/2014 (5500 yards)

    d.    Digital Multipurpose Warehouse (Fort Stewart), completed on or about 12/1/2014 (5500 yards)

    e.    Ga DOT – Jimmy Deloach Phase II (Bridges), completed on or about 12/31/2014 (5770 yards)

    f.    Sterling Creek Wastewater Treatment Plant, completed on or about 3/1/2015 (6000 yards)

    g.    Interstate 16/SR 404 Concrete Rehabilitation, completed on or about 12/31/2015 (4115 yards)

    h.    Guyton Wastewater Treatment Plant, bid on 12/16/2013, believed to be still pending.

    i.    Truman Parkway, Phase 5, completed on or around 12/31/13.

    j.    Landing Pads at the Marine Air Station in Beaufort, South Carolina in 2012

    k.    Marine Corps Air Maintenance Hangar, in Beaufort South Carolina in 2012

    l.    Paris Island Sub Station, in Paris Island, SC in 2012

137.    Defendants and co-owners Tommy Strickland and his nephew Timothy "Bo" Strickland exercised full and final authority over all pricing decisions for ready-mix concrete sold by Defendant Evans.  Defendants Tommy Strickland and Bo Strickland exercised final authority for

prices of ready-mix concrete, additives, and related charges that were stated on price sheets, stated on bids, stated in quotes or otherwise offered to customers or applied to sales by Evans.

138.    Defendants Greg Melton, Tommy Strickland, and Bo Strickland engaged in ongoing discussions concerning the need to control the market of which their companies were the only significant players and to keep prices up and what their respective companies would charge for ready-mix concrete; they also reached specific agreements setting such prices or price increases and choosing and dividing up jobs from their largest customer, Georgia Southern University which is a division of the University System of Georgia, a subdivision of the State of Georgia, receiving Federal funding.  Defendants, individually and through other Lafarge/Argos employees, including management, engaged in ongoing discussion concerning the prices to be offered by their respective companies for certain bids, and reached agreements concerning which company should submit the anticipated winning bid and the prices their respective companies would offer in such bids.  Relator learned of these activities once he assumed sales responsibilities in Statesboro in 2012 and learned of this existing price fixing arrangement.

139.    Greg Melton utilized the Statesboro Scorecard, a copy of which was provided to the Government by the relator, to make sure that they were dividing the market properly.

140.    As a result of these illegal price fixing activities, Defendants Greg Melton Tommy Strickland and Bo Strickland drove the price of ready-mix concrete approximately $10.00 a yard higher for jobs at Georgia Southern University and other customers than the price that Lafarge/Argos was receiving for the same project in Savannah.

141. For example, in February 2013, Relator was directed by Greg Melton, who called himself, "the prick with the stick," not to bid any project in Statesboro below $90.00 (per 3000 psi) per yard when Evans was involved. Melton further explained that he had things worked out there.

142.  On November 8, 2012, Greg Melton informed the relator that their boss, Andy Stankwytch had instructed them to draft a price increase letter to match Elite who was going up on January 1, 2013.  On that same date, Greg Melton then stated that they will go to $85 per yard on a large Statesboro job known as Aspen Heights as his scorecard shows that this should be their job because Evans has had more work their lately.  The excuse for that bid, if asked by Evans, was going be that the customer was their loyal customer from Atlanta.  Greg then printed out the scorecard to review it with Andy Stankwytch.  Jim Pedrick agreed that they could talk their way out of winning that job if confronted about undercutting Evans.  Jim Pedrick also agreed to compare Argos Cement's sales to Evans to make sure that Evans was honoring the scorecard agreement.

143.  Also on November 8, 2012, Jim Pedrick of Argos Cement informed relator that David Melton is demanding that Argos get their price increase letter out by the end of the week as they are all going to $88 per yard.

144.  On November 1, 2012, Jim Pedrick confirmed that Argos and its conspirators had all agreed on a price increase of $8 per yard.

145.   In connection with the Georgia Southern University Sports Facility bid rigging, Relator learned from an employee of Lafarge/Argos that Greg Melton and Bo Strickland had agreed to move the price for ready-mix concrete from $90.00 to $92.00 per yard.

146.   On or about January 29, 2013, at a meeting in Greg Melton's office in Pooler, Georgia, Greg Melton met the Relator and Tommy Waters, a Lafarge/Argos salesman for Statesboro, Hilton Head, and Savannah.  At this meeting Greg Melton produced a list entitled "Statesboro Projects starting in 2012" with his handwritten notes (attached in Relator's exhibits) showing which jobs it was agreed would be Argos or Evans.

147.   On June 15, 2012, Relator was present when Greg Melton was telling another salesman

that he and Bo Strickland had agreed to split up upcoming jobs in Statesboro.  Greg Melton told

Tommy Waters to quote $89.00 on the Georgia Southern University Dining Facility job and that

Evans will quote $91.00.

148.    Defendant Greg Melton highlighted the projects that Defendants Greg Melton and Bo

Strickland had agreed would be Argos projects and agreed who would win current projects up for

bid.  For example, the list, referred to as the "Statesboro scorecard," which is attached in Relator's

exhibits, gave the Georgia Southern University Biology Building, Georgia Southern University

Recreational Facility, Douglas Monarchs Apartment Complex and Georgia Southern University

Dining Facility to Evans.  Notably, the "Statesboro scorecard" attached in Relator's exhibits

contains Greg Melton's handwritten notes.  Greg Melton instructed Argos cement salesman Jim

Pedrick to "tell BO Strickland that on small stuff we are going to $92.00."

149.    Customers who received annual price quotes or contracts from Defendants Lafarge/Argos

and Evans were offered prices that were derived from an agreed upon starting point, or reflected

agreed increases, as a result of the conspiracy.  Because Defendants Lafarge/Argos and Evans

share very high or complete levels of market concentration and market power for the supply of

ready-mix concrete in the Statesboro, Georgia area, customers like Georgia Southern University

who received price quotes would not be able to seek a competitive price from another supplier.

Moreover, Defendants would not allow Relator or any other salesperson or agent of Argos to use

rebates against Evans Concrete, but would allow it to outbid non-conspirator competitors.

150.    Through the targeted use of rebates, Argos Ready Mix and its conspirator competitors

enjoyed an approximately $7 per yard advantage over non-conspirators.

151.  On or about September of 2015, the conspirators began discussions on the 2016 price increase

for readymix concrete.  On September 30, 2015, Argos and, shortly thereafter, Thomas both issued

a $12 per yard price increase.

152.    In addition to the coordination of price increases, the Defendants also allocated territory to give greater profits to each.  On February 2, 2016, Greg Melton informed the relator that he had agreed to give Thomas Concrete the Savannah Harbor Expansion Project (SHEP) as long as he gets the rebate approved from Argos Cement on other jobs that he had selected.   SHEP is an approximately $900 million project managed by the Army Corps of Engineers to deepen the Port of Savannah.  The funding for the project consists of 75% direct federal funding and a 25% contribution by the Georgia Ports Authority and Georgia Department of Transportation.  The majority of the phases of these projects began in February of 2016 and were completed in 2018 or beyond.

153.    On May 12, 2016, Greg Melton met with his sales team to go over the "Get Busy Report" which is sent to Mike Taylor each week.  This report is a list of all jobs bidding in late 2015 and 2016, including government and federally funded jobs.  The report contains, among other things, a list of all jobs which were won with cement credits.  While reviewing the report with the team, Greg Melton informs the group that Argos Cement will not approve rebates for jobs that Evans Concrete is also bidding on.

154.    Defendants Greg Melton, Tommy Strickland and Bo Strickland enforced the customer and price agreements between their respective companies through bid rigging.  Defendants Greg Melton and Bo Strickland individually and through Lafarge/Argos employees engaged in regular and ongoing discussions with one another concerning bids for specific projects.  During these bid rigging discussions, Defendants Greg Melton, Tommy Strickland, and Bo Strickland agreed which of their respective companies would submit the anticipated successful bid and at what price or prices, and the price or prices that would be bid by the anticipating losing party.

155.    By rigging bids, Defendants Greg Melton, Timothy Bo Strickland, and Tommy Strickland could enforce their existing agreements regarding prices and territories, collectively meeting their shared goals of keeping prices up for larger projects and allocating projects among themselves, particularly with Georgia Southern University, among others.  Bid rigging allows parties to a price fixing or territorial agreement to deter cheating on the agreement on particularly lucrative projects that otherwise reward cheating.

156.    According to key employees of Lafarge/Argos, these price fixing arrangements between Defendants Lafarge/Argos, Greg Melton and Evans and Tommy and Bo Strickland have "gone on for years."  Even if Lafarge/Argos loses a bid it still wins because Evans buys its cement from Larfarge/Argos.  Cement composes approximately 35% of the total price of a typical order.

157.    At a meeting held in Defendant Lafarge/Argos' Louisville location on February 12, 2012, Greg Melton asked salesman Tommy Waters and Relator to list jobs in Statesboro that Lafarge/Argos recently lost to Evans and to list jobs coming up.  Greg Melton said that "he had talked with Bo Strickland and they had an agreement that we would get the next few jobs since Bo Strickland had been awarded the Biology Building at Georgia Southern University."

158.    Approximately 5 days later, Ryan Parker, Lafarge/Argos' quality and assurance manager for Savannah and Hilton Head during a car ride described to Relator how Harry Miskelly of Lafarge/Argos and Lafarge/Argos price fixed the Georgia Southern Biology Building.  Ryan Parker also related another conversation that he had several months earlier where Harry Miskelly told Ryan Parker that "there was an agreement in place and that we better not take the job, that we better let Evans have the job."

159.    Relator learned from other Lafarge/Argos employees that Defendant Greg Melton and Bo Strickland agreed to split supplying the concrete to the new Georgia Southern University Sports

Stadium.

160.    Direct purchase of ready-mix concrete from the Savannah and Statesboro areas were substantially impacted by the cartel and conspiracy between Defendants to fix prices, divide jobs, and their enforcement of agreements to fix prices and divide jobs, through bid rigging.  These purchasers included various governmental entities that paid substantially more for ready-mix concrete than they would have in the absence of the conspiracy and suffered antitrust injury to their business or property.

## IX.

## ILLEGAL REBATES TO CONTRACTORS FOR READY-MIX
## CONCRETE AND OTHER GOODS AND SERVICES

161.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein

162.    Relator is aware that Defendants Lafarge/Argos have and continue to pay contractors and builders an undisclosed "rebate" or "incentive fee" which illegally inflate the prices of ready-mix concrete by upwards of 6 – 10% in South Carolina and Georgia.

163.    Relator believes that this rebate practice in the residential, commercial, and government markets continues by Defendant Lafarge/Argos and others in all of its markets throughout the Southeast.

164.    Relator believes that Elite and other competitors are also paying such rebates in Savannah and other markets.

165.    In the course of Relator's investigation Relator has obtained additional evidence that customers of Defendant Argos, including Brasfield & Gorrie, LLC (where Pat Mooney, former President of Argos Southeast, is now employed), also illegally accepted and retained discounts, rebates, and kickbacks by Defendant Argos and other subcontractors for government contracts

(such as Ram Tool Construction Supply Co., based in Birmingham, Alabama) with the State of Georgia, local governments in Georgia and the federal government and its instrumentalities or others. Based on conversations with Argos employees, Relator does not believe that these discounts, rebates, or kickbacks were passed along to the state or federal government or their instrumentalities. Relator has obtained a "Rebate Agreement" used from time to time by Argos to memorialize certain of these payments and is attached in Relator's exhibits.

166.    On or about June 5, 2013, Defendant Greg Melton told Relator that in connection with the job at Georgia Southern University that Defendant Brasfield & Gorrie needed a price break on the job and that "a price break will be handled back door." He also continued by adding that Defendant Pat Mooney was handling the rebate on the "the back end." Defendant Greg Melton stated that he [Pat Mooney] may "know something about the backdoor dealings." Relator has obtained a purchase order for this Argos/Brasfield & Gorrie job for Georgia Southern University which clearly states that Argos gives Brasfield & Gorrie a standard rebate/kickback. On page 2 of the purchase order it clearly states "[T]he pricing below is Argos standard pricing and does not reflect the $5 discount/rebate . . . on all orders for Brasfield & Gorrie."

167.    Relator learned that Pat Mooney and Jim Lambert at Argos in Atlanta were among the key Argos personnel authorizing and distributing these illegal discounts, rebates, and kickbacks.

168.    Many of the contracts awarded to Defendant Brasfield & Gorrie by the Georgia State Financing Investment Commission on behalf of Georgia Southern University and the University of Georgia contain a requirement to refund discounts, rebates, and kickbacks. Section 4.4.10 of the Construction Management Agreement dated September 1, 2011 for the Georgia Southern Biology Building required Brasfield & Gorrie to refund discounts, rebates and kickbacks.

> *4.4.10 Discounts, Rebates, Etc. The CM/GC shall provide the Owner an opportunity to provide funds to take advantage of discounts for prompt payment*

> *of materials supplies, equipment, etc.  <u>Any trade or quantity discounts, rebates,</u>*
> *<u>refunds, and/or proceeds from the sale of surplus materials or equipments shall</u>*
> *<u>be credited to reduce the Cost of the Work.</u>*

169.    By further way of example the Construction Management Agreement by the Board of Regents of the University System of Georgia dated March 1, 2006 for the University of Georgia Performing Arts and Visual Complex Building (cost over $31,000,000.00) required Brasfield & Gorrie to refund discounts, rebates, and kickbacks.

> *1.5.1.0 Discounts, Rebates, Etc.  The CM/GC shall provide the Owner an opportunity to provide funds to take advantage of discounts for prompt payment of materials supplies, equipment, etc. If the Owner chooses to take advantage of such discounts, the savings shall accrue to the Owner and shall have no impact on the Cost of the Work.  If the Owner chooses not to take advantage of such discounts and the CM/GC decides to do so with the funds of the CM/GC, the savings shall accrue to the CM/GC and shall have no impact on the Cost of the Work. Any trade or quantity discounts, rebates, refunds, and/or proceeds from the sale of surplus materials or equipment shall be credited to reduce the Cost of the Work.*

170.    The aforementioned contract language appears in a variety of versions of the contracts used by the Georgia State Investment and Finance Commission, the Board of Regents of the University System of Georgia and other state related entities and instrumentalities.

171.    Based on Brasfield & Gorrie's website alone, it has many other contracts throughout the Southeastern United States including offices in Georgia, South Carolina (Greenville), North Carolina, and Florida.

172.    In solicitations for contracts at various military installations, including Hunter Army Airfield by further way of example only, the solicitations and/or contracts contain anti-kickback procedures under the Federal Acquisition Rules ("FAR") Clause 52.203-7, and are incorporated by reference into the contracts and/or solicitations.  Various provisions of FAR, such as FAR 52.203-7 Anti-Kickback Procedures, are incorporated by reference into many federal government

contracts. These provisions apply to not only prime contractors but also to subcontractors and others.

173. Lafarge/Argos violated the Anti-Kickback Statute 42.U.S.C. § 1320-7b(b) in its knowing and willful payment of remuneration for generating business through government contracts and failing to pass on any rebates to governmental entities involved in its contracts for jobs with Brasfield & Gorrie and Evans General Construction, LLC.

## X.

## LAFARGE/ARGOS UNLAWFUL RETALIATION

174. Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein

175. Relator believes that as a result of his complaints to Pat Mooney about price fixing and the complaints by other Lafarge/Argos employees that Defendant Lafarge/Argos commenced annual "Antitrust Training" sessions with lawyers from McGuire Woods as the speakers. Despite these known antitrust conspiracies, sessions were held only in late 2011 and on March 14, 2013. In attendance at these meetings were approximately 30 Lafarge/Argos employees including, among others, Greg Melton, Relator, Hugh Papy, Jr., and Tommy Waters. These events are just "window dressing and a dog and pony show."

176. In an effort to protect his cartel and prevent further reporting of wrongdoing by his employees, Greg Melton intimidated, harassed and threatened his employees before and after these meetings to prevent further disclosure of his illegal price fixing. At one of these meetings, Greg Melton texted Relator during the antitrust meeting and told Relator to tell Salesman Hugh Papy, Jr., who had asked a series of questions, to "Shut the f_ck up." Once he started asking questions during the training, Relator and other Lafarge/Argos employees, were scared for their lives and

livelihood.  To intimidate and harass Relator and to show his complete lack of concern for violating the law, at the late 2011 meeting, Greg Melton texted Relator that Relator "would look good in prison stripes."  Greg Melton knew that his high school friend and boss, Pat Mooney would cover up his illegal activities. Greg Melton was ultimately appointed by Argos counsel, as head of Anti-Trust for the Savannah Division.

177.    Immediately after this antitrust meeting, David Black, Pat Mooney's right hand man, approached Hugh Papy, Jr., and told him to "Shut up and keep doing what you are doing" and "Don't rock the boat."  Mr. Papy was visibly upset because he was participating in training and asking valid questions about preferred pricing to customers and seeking advice.

178.    Greg Melton continued to publicly belittle and harass Relator because of Relator's previous reporting of antitrust activities to Pat Mooney, and Relator's reluctance to illegally give business to Greg Melton's brother David Melton at Elite.

179.    This harassment plus the loss of business to Lafarge/Argos because jobs were given by agreement to competitors caused Relator and other salesmen to lose bonus revenue.  During his employment with Argos, Relator was reminded on more than one occasion by Argos that he is subject to a non-compete agreement and could not work for a competitor.  Relator was also denied promotions and other career advancements.  Relator suffered anxiety and depression due to Argos' treatment of Relator after his reporting the illegal activity to Pat Mooney.

180.    On May 25, 2012, Hugh Papy emailed the relator and Greg Melton regarding the Fuji Tank job with Mahany stating that "this job bid today.  We were at $89 for 4000 psi.  Elite was at $80. Glad they're on board with the price increase."  At 12:59 PM, Greg Melton responded by email instructing the relator to "Call David and tell him how much he left sitting in the table."  On May 31, 2012, Greg Melton explained to the relator that he had decided to let Elite have the Fuji Tank

job and others with Mahany as Argos Cement had agreed to let him use rebates on a number of

other bids since Elite was not going after those projects.

181.    On April 11, 2013, Relator learned that Greg Melton was frantically shredding documents

in his office, seeking to destroy evidence of the cartel conspiracy.  It is not known at present who

or what has triggered this cover-up or whether Greg Melton was instructed by Pat Mooney or

others at Lafarge/Argos to destroy documents to cover-up the cartel conspiracies.  Relator has

salvaged many of these destroyed documents.  Relator later learned that Argos appointed Greg

Melton head of anti-trust issues for the Savannah market.

182.    In late 2011, Relator met with the Federal Bureau of Investigation (FBI) and the Atlanta

Antitrust Field Office of the U.S. Department of Justice (DOJ) in late 2011 regarding activities

related to price fixing and conspiracies and he continued to communicate with them and provide

evidence regarding the activities through December of 2020;

183.     Relator provided documentary and other evidence of collusion in the form of price fixing,

bid rigging and territorial allocation by Argos and other co-conspirators; this included a trip to

Washington, DC on December 2, 2019, to review the materials and provide a copy of the

Statesboro Scorecard with Greg Melton's handwriting on it;

184.    Based upon information and evidence that the Plaintiff provided to the government, and

his attorney, he became the Relator in a qui tam complaint filed in 2013.

185.    While the qui tam complaint was still under seal, the Plaintiff was repeatedly confronted

and questioned as to whether he was the whistleblower.

186.    That the Defendant Argos gained access to the qui tam complaint prior to it being unsealed

which confirmed the identity of the Plaintiff as the whistleblower.

187.    Greg Melton and other members of Argos management threatened, intimidated, and

harassed Plaintiff, and other employees, of Argos to prevent disclosure of illegal price fixing and other illegal schemes, including the sale of sub-standard concrete, throughout Plaintiff's employment with Argos.

188.    Harassment by Greg Melton, Pat Mooney, and others at Argos, plus the loss of business to Argos due to Greg Melton's illegal bid-rigging, by which he would ensure that his brother's company, Elite Concrete, LLC, would win bids, caused the Plaintiff to lose bonus revenue and other compensation, and fear that he would be black-listed from the cement/concrete industry;

189.    While that qui tam action was voluntarily dismissed without prejudice by his attorney, on July 7, 2016, Plaintiff was illegally terminated by Defendant and in retaliation for informing the government about Defendant's illegal activities and for bringing an action against the Defendant under the False Claims Act;

190.    Argos had a three write-up policy prior to termination of an employee, and in 19 years of employment with Lafarge/Argos, he had never been written up by his employer.  Two days before he was fired, Relator sent company counsel an email describing more corruption/concerns and expressed that he did not want to be retaliated against.

191.    Plaintiff suffered pecuniary and other harm as a result of his harassment, discrimination, and retaliatory discharge by Defendant;

192.    In addition to the harassment, discrimination, and retaliatory discharge suffered by Plaintiff at the hands of the Defendant, Defendant also retaliated against Plaintiff in initiating a civil action against him which alleged that he engaged in stealing trade secrets in violation of the Defend Trade Secrets Act (18 U.S.C. § 1836), the Georgia Trade Secrets Act (Ga. Code Ann. § 10-1-760 et seq), and that he also engaged in computer fraud, conspiracy, and conversion, among other allegations; See *Argos USA, LLC v. Christopher Young and Southeast Ready Mix, LLC* Case No.: 1:18-cv-

02797-ELR, United States District Court, Northern District of Georgia, Atlanta Division;

193.    The Defendant's allegations in that action were blatantly false, which they have recently stipulated to in the DPA, Defendants knew their allegations to be false, and Defendants made these false allegations for the sole purpose of retaliating against Plaintiff for pursuing his <u>qui tam</u> action;

194.    Defendants retaliatory actions against Plaintiff were in violation of federal law and the public policy and laws of the State of South Carolina;

195.    Plaintiff has suffered pecuniary and other harm as a result of this lawsuit;

## XI.

## DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

196.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein

197.    In order to receive payment from the United States Government, South Carolina, Georgia, and other governments for services, Defendants intentionally or knowingly made, prepared or caused to be made or prepared false statements and false claims for payment or approval, based upon the records and rules described above, and intentionally or knowingly presented or caused them to be presented to an officer or employee of the United States Government, the States of Georgia and South Carolina, and local governments in order to obtain approval and payment form the Government.

198.    Defendants' records and claims for payment were false or fraudulent because, individually and collectively, Defendants falsely and improperly did not disclose to the United States Government, the State of South Carolina, the State of Georgia, and local governments common arrangements to discuss and affect prices under contracts awarded by these governmental entities.

199.    Defendants' records and claims for payment were false or fraudulent because Defendants falsely represented, directly or indirectly, in submitting claims for payments that they had not engaged in common discussions or agreements regarding prices to be offered and terms and conditions of services, such as allocation of territories or market share among one or more Defendants for work performed under the U.S. Government or other state or local governments.

200.    Defendants' actions to repeatedly mischarge, intentionally or knowingly, on their contract and subcontract agreements violated the terms of contracts between one or more Defendants and the U.S. Government and other state and local governments, including certifications that pricing proposals to the Government were arrived at independently of one another.

201.    Defendants' obligations to comply with the terms of the prime Government contract is a requirement that may not be waived by any Government employee other than in limited and appropriate circumstances, by contracting officers, and if done in writing and otherwise pursuant to applicable law.

202.    Defendants intentionally, knowingly, and/or recklessly failed to make the necessary inquiry to establish that claims submitted to the U.S. Government and other governments and political subdivisions were not false or fraudulent under the False Claims Act.

203.    In seeking payment from the U.S. Government, among other governments and political subdivisions, Defendants falsely certified that the payments requested were in accordance with contract terms and rules when in fact they were not.

204.    The requests for payment submitted by Defendants pursuant to Government contract were false claims.

205.    Relator, the general public, the United States, South Carolina, Georgia, and local governments and political subdivisions were harmed by Defendants' actions.

206.    This action is not based upon any prior public disclosures, as that term is defined in the False Claims Act, nor have any prior public disclosure of the allegations or transactions alleged in this action occurred, except those initiated or made by Relator.

207.    Relator is knowledgeable about Defendants' operations and has direct and independent knowledge of the information on which these allegations are based and is an original source as defined in 31 U.S.C. § 3730(e)(4)(B).  Relator has voluntarily provided this information to the United States Government prior to filing suit, including by voluntarily providing extensive and detailed information to the U.S. Department of Justice in Atlanta, Georgia and the FBI.

## XII.

### ARGOS DEFENDANTS' FALSE CLAIMS AND FRAUDULENT MISREPRESENTATIONS IN ENTERING THE DEFERRED PROSECUTION AGREEMENT OF JANUARY 4, 2021

208.    Plaintiff reiterates and incorporates all of the above allegations as set forth above as if repeated verbatim herein

209.    On or about September 2, 2020, after Relator's Complaint had been filed, Defendants Evans Concrete, James Clayton Pedick, Gregory Hall Melton, and Timothy Tommy "Bo" Strickland, along with, at that time unnamed Defendant corporations, were indicted for violations of Sherman Act, for the conspiracies to suppress and eliminate competition by fixing prices, rigging bids, and allocating markets for sales of ready-mix concrete, as detailed and discussed above;

210.    The indictment came after years of Relator reporting Defendants' criminal conduct to Argos Presidents, Regional Manager, H.R., and Argos in-house and outside counsel and Federal authorities during his employment with Argos, from 2010 to 2016;

211.    The violations of the Sherman Act as indicted cover conduct and conspiracies to suppress

and eliminate competition from "as early as 2010 and continued until or about July 2016;"

212.    Relator is the original source of Defendants' underlying false and fraudulent presentment claims as discussed at length above;

213.    Incidentally, Relator was terminated in July 2016, the same month and year of the end of Defendants' conspiracies and criminal acts as alleged in the indictment;

214.    On or about January 4, 2021, Defendant Argos USA, LLC entered into a deferred prosecution agreement with the United States whereby it "admits, accepts, and acknowledges that, under U.S. federal law, it is responsible for the acts of its officers, directors, employees, and agents that give rise to the charges in the Information. The Company admits, accepts, and acknowledges that the facts set forth in the Statement of Facts are true and accurate."

215.    The parties to the agreement are Argos USA, LLC, and the company's direct and indirect parents, Argos North America Corp. and Cementos Argos S.A.

216.    Among the facts that Defendant Argos USA, LLC admit are true and accurate are as follows:

    a.    the company was involved in fixing prices, rigging bids, and allocating markets for the sale of ready-mix concrete by the Company and its conspirators in the greater Savannah, Georgia area (including Statesboro, Georgia, and Hilton Head Island, South Carolina), resulting in a per se unlawful violation of the Sherman Act, 15 U.S.C. § 1;

    b.    the illegal conduct was limited to a small number of employees who joined the Company through an asset acquisition of another company in October 2011, after the conspiracy had already begun.  These employees worked in a local sales office in Pooler, Georgia, which office was responsible for approximately 1% of the Company's annual revenues and employed

less than 1% of the Company's workforce.  The Company's management outside the office in Pooler, Georgia, did not participate in or condone the conduct;

     c.     on September 22, 2020, a grand jury indicted, and the United States in prosecuting, two former Company employees, Gregory Hall Melton and James Clayton Pedrick, in *United States v. Evans Concrete, LLC, et al.*, No. 4:20-cr-00081 (S.D. Ga.).  These two individuals were the employees primarily responsible for the Company's participation in the charged conspiracy;

     d.     the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including by ensuring that its compliance program and internal controls, including by ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement;

     e.     the Company has taken remedial actions to address the misconduct that is subject of this investigation, including revising and enhancing its antitrust compliance program to directly address the issues, conducting specific antitrust training for Savannah-area employees, and terminating the employees primarily responsible for the Company's participation in the illegal conduct;

217.    As part of the agreement, Argos USA, LLC and its parent entities agree that full, truthful, and continuing cooperation pursuant to the agreement included but are not limited to the following:

     a.     producing to the United States all documents, information, and other materials, wherever located, not protected under the attorney-client privilege or the work-porduct doctrine

     b.     using its best efforts to secure the full, truthful, and continuing cooperation of current and former officers, directors, employees and agents of the Company and the Parent Entities as may be requested by the United States in its sole discretion.  Such efforts will include, but not be limited to, making these persons available in the United States and at other mutually

agreed-upon locations at the Company's or the Parent Entities' expense for interviews and the provision of testimony in grand jury, trial, and other judicial proceedings in connection with the Federal Proceeding; and

c.      with respect to any information, testimony, documents, records or other tangible evidence provided to the United States pursuant to this Agreement, the Company and the Parent Entities consent to any and all disclosures to other governmental authorities, including federal, state, and local authorities and those of a foreign government of such materials as the United States in its sole discretion shall deem appropriate.

218.    As part of the Deferred Prosecution Agreement, the United States and the Company agreed that the Company will pay a monetary penalty in the amount of $20,024,015.00 to the United States Treasury within thirty (30) days of the Effective Date of this Agreement.  The Company and the United States agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 5.  The monetary penalty is calculated under the United States Sentencing Guidelines, based on the volume of commerce of at least $83,433,397 done by the Company;

219.    The Deferred Prosecution Agreement was signed and executed by William Wagner, President of Argos USA, LLC, and Howard Feller, Counsel for Argos USA, LLC.

220.     In an attached certificate, the Company's General Counsel, Mark Prybylski, together with Howard Feller, certified that William Wagner is authorized, empowered and directed to execute the deferred prosecution agreement;

221.    Although Defendant Argos certified through its agents that the information contained in the deferred prosecution agreement was true and accurate, Defendant and their agents knowingly, intentionally misled and gave false information to the U.S. Government in making the agreement;

222.    Defendant Argos USA, LLC falsely certified the full extent of the conspiracies and illegal activities engaged in by Defendant and its agents, the extent of the market affected by their conspiracies, and the extent of the knowledge of these conspiracies and illegal activities by agents of Defendant Argos USA, LLC;

223.    The extent of the market affected and volume of commerce done by Defendant Argos USA, LLC, was actually much larger than the $83,433,39.00 reported by the Defendant, as market affected involved more than just Savannah, Pooler, and Hilton Head Island areas of Georgia and South Carolina, referred to above as the Savannah market; Additionally, the purported volume of commerce excluded the increase in earnings by Argos Cement as a result of these anti-competitive acts.

224.    Rather, the anti-competitive practices and conspiracies of the Argos Defendants was pervasive throughout the company and its operations throughout the entire Southeast, and permeated the company's culture;

225.    As discussed above and as noted in the Blue Circle Memorandum, William Wagner, a signatory of the Deferred Prosecution Agreement was a major proponent of the same or similar anti-competitive activities discussed in that Memorandum during his tenure as President of Argos USA, LLC, as he was when he was President of Blue Circle;

226.    Rather than the discovered illegal activity in the Savannah Market being a "one-off" or simply errant misbehavior on the part of lower to middle management of the Argos Defendants, the anti-competitive and illegal activity in violation of the Sherman Act was engrained in the companies' cultures and was encouraged from the top;

227.    William Wagner, who assumed his role as President of Argos USA, LLC in 2014, was informed by the Relator of the David Melton and Gregory Melton's price fixing during the

Summer of 2014;

228.    On or about January of 2014, Pat Mooney called Relator and informed him that he and Bill Wagner had discussed the Melton brothers' price-fixing and that Greg Melton needed to be replaced.

229.    To further illustrate William Wagner's knowledge and complicity in the Argos Defendants' anti-competitive practices and conspiracies throughout the Southeast, during a conversation on February 29, 2016, which was recorded by the Relator and provided to the government, William Wagner stated in a conversation with the salespersons including Relator that they should tell all of their competitors the ultimatum that if they did not raise prices in the Savannah market, that he was going to "drop the hammer" on them like he did years ago, during his time as President of Blue Circle;

230.    By "drop the hammer," William Wagner was referring to the manner in which he, in previous years, had directed the companies that he had served in a leadership role, to offer and sustain lower than profitable ready-mix concrete prices to hurt the business of smaller and less financially robust cement and ready-mix concrete companies, and ultimately eliminate them as competition in the market inhabited by Argos Defendants, unless they agreed to conspire with the Argos Defendants to artificially fix prices;

231.    Additionally, many other members of the upper leadership and management within Argos Cement and Argos USA, LLC, knew about the illegal activities and conspiracies in violation of the Sherman Act including but not limited to:

a.    Chip Hussey (Vice President of Cement Sales) – Chip approved cement rebates and repeatedly told salespeople not to use them against Evans Concrete, a co-conspirator in the Savannah market;

b.      Mike Taylor (former Vice President of Argos Ready-Mix) stated several times throughout Relator's employment with Argos USA, LLC, that he had to get permission to use rebates against certain competitors, and Mike Taylor told Relator that Chip told him we could only use cement rebates to hurt competitors who did not buy cement from Argos Defendants;

c.      Mark Prybylski, Argos in-house Counsel and signatory of the Deferred Prosecution Agreement, and Howard Feller, outside counsel and signatory of the Deferred Prosecution Agreement were made aware of the price fixing by Relator and Hugh Papy, Jr., among others for several years preceding federal investigations and Relator's termination in July 2016;  In fact, on January 4, 2014, the relator met with Howard Feller and explained to him, not only specific instances of price-fixing but also explained when and how he had reported it to Mark Prybylski and Pat Mooney as early as March of 2010.  The relator also personally delivered a copy of the Statesboro Scorecard to Howard Feller at this meeting.

d.      As discussed above, Pat Mooney, former President of Argos USA, LLC, and predecessor to William Wagner, was made aware of the price fixing as early as 2010 until he left the company in 2014, and in late 2011. In response to an email from Relator concerning price fixing and bid rigging by the Melton brothers, Pat Mooney told Relator never to send him "that sh_t again" and that because of Relator, he would have to let the company attorney (Mark Prybylski) know about the price fixing;

232.    As discussed above, in addition to anti-competitive behavior permeating the company culture, price increases on cement and ready-mix were coordinated and standardized throughout all of Argos' Defendants locations in the Southeastern United States and were shared with conspirator competitors throughout the Southeast in substantially the same or similar manner in which they were shared in the Savannah market.

233.    The true extent of Argos Defendants' volume of business which was tainted by their criminal activities and conspiracies, is well into the hundreds of millions of dollars;

234.    In misrepresenting the full extent of the volume of business tainted by their criminal activities and conspiracies, Argos Defendants further defrauded the government in violation of the False Claims Act;

## COUNTS

## COUNT I

### VIOLATION OF 31 U.S.C. § 3729(a)(1)
### (AGAINST ALL DEFENDANTS)

235.    Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

236.    Defendants knowingly presented or caused to be presented to officers or employees of the United States Government and/or members of the Armed Forces of the United States false or fraudulent claims for payment or approval. Defendants' claims were false claims under the False Claims Act because:

237.    Defendants discussed means of bid-rigging, commonly setting prices, allocating markets and fixing other terms for cement and Ready-Mix Concrete provided to the United States Government.

(a).    Defendants discussed means of bid-rigging, commonly setting prices, allocating markets and fixing other terms for cement and ready-mix concrete provided to the U.S. Government.

(b).    Defendants acted to implement their scheme(s) of bid-rigging, setting prices, allocating markets and fixing other terms cement and Ready-Mix Concrete provided to the United States Government.

(c).    Defendants' offers to provide cement and Ready-Mix Concrete to the United States Government were not independently arrived at; and

(d).    Defendants' requests for payment under contracts (or subcontracts thereto) cement and ready-mix concrete to the United States Government were made without disclosure of common discussions and arrangements to rig bids, set prices, allocate territories and fix other terms for services to the United States Government.

(e).    Due to their anti-competitive behavior and conspiracies, the United States Government and other state and local governmental entities were systematically and fraudulently overcharged when Defendants and their co-conspirators were the only parties bidding on government or government-funded jobs to supply ready-mix concrete, and any time they presented payment for work which included environmental surcharges, which were completely fabricated and not used to pay for any sort of environmental clean-up or remediation.

## COUNT II

### VIOLATION OF 31 U.S.C. § 3729(a)(2)
### (AGAINST ALL DEFENDANTS)

238.    Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

239.    Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States Government.

## COUNT III

## VIOLATION OF 31 U.S.C. § 3729(a)(3)
## (AGAINST ALL DEFENDANTS)

240.    Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

241.    As more fully described above, Defendants conspired to defraud the Government by getting a false or fraudulent claim allowed or paid. This included the payment of prices by the United States Government, the States of Georgia and South Carolina and Local Governments that were inflated as a result of Defendants' anticompetitive price fixing and bid-rigging schemes.

## COUNT IV

## VIOLATION OF 31 U.S.C. § 3729(g)

242.    Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below;

243.    As more fully described above, in misrepresenting the full extent and scope of their criminal activities and conspiracies in violation of the Sherman Act, and the volume of business affected by their illegal activities and conspiracies to the government in entering the Deferred Prosecution Agreement, Defendants fraudulently induced the Government into the agreement;

244.    In making these material falsehoods to the Government, Argos Defendants intended to avoid paying additional money in damages, penalties and/or fines to the government;

245.    The material falsehoods submitted to the Government in making the Deferred Prosecution Agreement are a violation of the False Claims Act, as Argos Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government and/or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government;

## COUNT V

## VIOLATION OF 31 U.S.C. § 3730(h)
## (AGAINST LAFARGE/ARGOS DEFENDANTS)

246.    Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

247.    At all relevant times, Relator was employed by the Lafarge/Argos Defendants.

248.    The Lafarge/Argos Defendants exercised sufficient control over the terms and conditions of Relator's employment and the terms and conditions of employment of those working with Relator such that the Lafarge/Argos Defendants were at all relevant times an employer within the meaning of the False Claims Act, 31 U.S.C. §3730(h).

249.    Relator was discriminated against in the terms and conditions of his employment, and was ultimately terminated, because of lawful acts done by them in furtherance of an action under the False Claims Act, in violation of 31 U.S.C. §3730(h).

250.    As a result of Defendants' conduct, Relator and his family members have sustained economic and other damages and seek punitive damages.

251.    Cementos Argos, Argos Concrete, and Argos USA are jointly and severally liable for the conduct of the Lafarge/Argos Defendants by virtue of their conduct, successor liability, and alter-ego liability.

## COUNT VI

## CONSPIRACY TO DISCRIMINATE
## RELATOR V. LAFARGE/ARGOS DEFENDANTS

252.    Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

253.     Defendants conspired, confederated, and agreed to threaten, harass, discriminate against, and ultimately terminate Relator in violation, among other things, of 31 U.S.C. § 3730(h).

254.     As a result of Defendants' conduct, Relator and his family members have sustained economic and other damages and seek punitive damages.

## COUNT VII

### CONSPIRACY TO INTERFERE CIVIL RIGHTS
### RELATOR V. LAFARGE/ARGOS DEFENDANDS

255.     Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

256.     Defendants have conspired, confederated, and/or agreed to interfere with, obstruct, and/or deprive Relator with regard to his civil rights in violation of 42 U.S.C. § 1985.

257.     As a result of Defendants' conduct, Relator and his family members have endured pain, suffering, mental anguish, and sustained economic and other compensatory damages and seek punitive damages.

## COUNT VIII

### LOSS OF REPUTATION, SLANDER, AND DEFAMATION
### RELATOR V. LAFARGE/ARGOS DEFENDANTS

258.     Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

259.     One or more of the Defendants, including Defendant Greg Melton in particular, intentionally, and with malice and ill will, have falsely stated or caused others to state falsely that Relator is not an intelligent, hardworking, successful, honest or truthful person in his business and other dealings with them.

260.    Since about December 2013, when the Defendants became aware of the investigation of the Department of Justice, the Office of the Inspector General, the Department of Defense, the U.S. Department of Transportation and other federal agencies, Defendant Argos and members of management including Defendant Greg Melton and his boss Bill Wagner, among others, isolated intimidated, harassed, threatened, belittled the Relator, and ultimately terminated him, materially damaging his position and standing within the business community.

261.    In addition to the harassment, discrimination, and retaliatory discharge suffered by Plaintiff at the hands of the Defendant, Defendant also retaliated against Relator in initiating a civil action against him which alleged that he engaged in stealing trade secrets in violation of the Defend Trade Secrets Act (18 U.S.C. § 1836), the Georgia Trade Secrets Act (Ga. Code Ann. § 10-1-760 et seq), and that he also engaged in computer fraud, conspiracy, and conversion, among other allegations; See *Argos USA, LLC v. Christopher Young and Southeast Ready Mix, LLC* Case No.: 1:18-cv-02797-ELR, United States District Court, Northern District of Georgia, Atlanta Division;

262.    The illegal and retaliatory lawsuit Defendants initiated against Plaintiff contained allegations that Defendants knew to be false, as now stipulated in the DPA.

263.    In addition to the knowingly false allegations included in Argos' illegal and retaliatory civil action, Defendants have published or caused to be published false and defamatory statements about Plaintiff, similar to those in Defendant's civil action, in trade publications including Concrete Products, dated June 22, 2018 titled "Argos USA probes ex-manager's massive data theft."

264.    These false statements and allegations were published by Defendants with actual or implied malice.

265.    As a result of Defendant's conduct, Relator and his family has been injured in their loss of reputation and standing in the community and have suffered embarrassment, humiliation, and

mental suffering because of the actions of Defendants and others acting in concert with them, causing Relators and their family members' pain, suffering, and mental and physical anguish. Relator also seeks punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself, the United States Government and the States of South Carolina and Georgia, pray:

(a)    That this Court enter judgment against Defendants, jointly and severally, in an amount equal to three times the amount of damages the US Government and States of South Carolina and Georgia have sustained because of Defendants' actions, plus a civil penalty of at least $5,500 to $11,000 for each action in violation of 31 U.S.C. 3729.

(b)    That in the event that the US. Government proceeds with this action or proceeds with any alternate remedy available to the Government, Relator be awarded an amount for bringing this action of at least 15%, but no more than 30%, of the proceeds of this action and of the proceeds of the alternate remedy or the settlement of any such claim, including the $20,024,015 that has already been paid.

(c)    That in the event that the United States Government elects not to proceed with this action, but pursues an alternate remedy, Relator be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of this action and of the proceeds of the alternate remedy or the settlement of such claim.

(d)    that the Relator, and the other named employees of Argos, receive from Defendants, jointly and severally, all damages and remedies including attorney's fees available under, among other things 31 U.S.C. § 3730(h), and 42 U.S.C. § 1985.

(e)    That the United States Government and Relator receive all relief, both at law and at equity, to which they may reasonably appear entitled;

(f)    That Relator be awarded all damages allowable by law including compensatory damages for pain, suffering, physical and mental suffering and injury caused by Defendants' conduct and punitive damages.

(g)    That Relator be awarded punitive damages, where allowed by law, because of Defendants intentional and malicious conduct which victimized Relator and his individual family members and included economic and emotional harm.

(h)    That Relator be granted such other relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED:

LAW OFFICE OF
DARRELL THOMAS JOHNSON, JR., LLC
Attorneys for Plaintiff

By:    s/Warren P. Johnson
Warren Paul Johnson (9524)
Joshua R. Fester (12513)
Darrell T. Johnson, Jr. (2190)
Post Office Box 1125
Hardeeville, South Carolina 29927
(843)784-2142
(843)784-5770 Fax
tdjohnson1@hargray.com
Our File No: 26-143-04-200-20

April 14, 2021